UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------X

DANIEL DAVIS,

                                Petitioner,

                                                    **OPINION & ORDER**
                                                    **CV-08-2674**

        -against-


LUIS R. MARSHALL, Superintendent

                                Respondent.

------------------------------------------------------ X

FEUERSTEIN, J.

On October 28, 2003, a judgment of conviction was entered against petitioner Daniel

Davis (petitioner) in the County Court of the State of New York, Suffolk County (Hinrichs, J.),

upon a jury verdict finding him guilty of manslaughter in the first degree (N.Y. Penal Law §

125.20), gang assault in the first degree (N.Y. Penal Law § 120.07), assault in the first degree

(N.Y. Penal Law § 120.10(3)) and two counts of assault in the third degree (N.Y. Penal Law §§

120.00(1)(2)), and upon imposition of sentence. On June 25, 2008, petitioner filed a petition

seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

For the reasons set forth herein, the petition is denied and the proceeding is dismissed.[1]


I.      BACKGROUND

        A.      Factual Background

---

[1] In light of this determination, petitioner's application, *inter alia*, for permission to
submit a copy of the original indictment on habeas review is denied as moot. In any event, the
original indictment was included in the state court record filed with this court on November 3,
2008 and, thus, was before this Court on habeas review.

The following facts were taken from the trial transcript (T.):

1.     The People's Case

a.     Eyewitness Testimony

On October 4, 2001, between 10:00 and 11:00 p.m., Alexander Nieves ("Alex"), Jose Torres ("Torres"), Alejandro Nanez ("Nanez") and "Muncho" went together to Club 69, located on Main Street in Bayshore, New York. (Alex: T. 467-468, 517-518; Nanez: T. 703-704, 734). At approximately 1:00 a.m. on October 5, 2001, Alex's older brother Jose Nieves ("Jose") arrived at the club. (Alex: T. 468, 536; Nanez: T. 704). Jose was a member of the Latin Kings gang and was known in the community as "King Blast." (Hodge: T. 104-105; Sanchez: T. 268, 289; Alex: T. 523-524). Dennis Hodge ("Hodge") and Josue Sanchez ("Sanchez"), both of whom knew Alex and Jose, were also at the club. (Hodge: T. 103-104; Sanchez: T. 238-240). According to Alex, he and his friends consumed approximately two (2) or three (3) alcoholic drinks at the club. (T. 469, 530-531). He denied being intoxicated and testified that his friends were "more buzzed" than he. (T. 530-532). Nanez testified that he had more than six (6) drinks that night and was "feeling the effects of that alcohol." (T. 704-705, 734, 749-750).

Alex testified that at approximately 1:00 or 2:00 a.m., he observed that the racial makeup of the patrons of the club was "mostly all black males." (T. 469-470, 534-535). At some point thereafter, an argument ensued somewhere in the club, as a result of which the club's bouncers made everybody leave the club. (Alex: T. 470-471, 519, 551; Nanez: T. 706, 725; Hodge: T. 105, 151; Sanchez: T. 240-242, 246-247). According to Alex, his brother Jose waved to him to get out of the club, and said "There is an argument going on, let's just leave." (T. 471, 552). Alex left the club with his friends and brother through the rear door. (Alex: T. 471, 552; Nanez:

2

T. 706). Nanez testified that a group of black males followed them out the back door of the club. (T. 706, 725). Hodge testified that he and most of the fifty (50) to seventy (70) people that were inside the club exited the club through the back door and into a parking lot. (T. 106). Sanchez testified that although most of the people exited the club through the back door, he exited the club through the front door because a security guard stopped him from going out the back. (T. 247-248).

When they left the club, at approximately 3:00 a.m., there was a man in a red shirt outside the club. (Alex: T. 471-472; Nanez: T. 707). Alex described the man as a black male in his mid-twenties, approximately six feet tall and heavy, with small dreadlocks. (T. 472). The man was saying "Bay Shore Bloods, this is my hood, my territory." (Alex: T. 472, 510; Nanez: T. 707, 751). Alex and Nanez later identified the man in the red shirt as Christopher Passias, whose nickname was "Fats" (hereinafter, "Passias" or "Fats"). (Alex: T. 487, 506; Nanez: T. 716-718). Alex testified that his brother told him to just "get in the car and let's go home." (T. 473). Nanez testified that he approached Passias and told him "the beef is not with us" and the two shook hands. (T. 707, 743-744, 751-752). According to Nanez, that was when he "got hit blindsided from the right," and was knocked unconscious. (T. 707-709, 722, 750). He did not know who hit him. (T. 708). Nanez testified that when he regained consciousness, his chain and cell phone were missing. (T. 715). He did not know who took those items. (T. 715-716).

Alex testified that in addition to Passias there were approximately fifteen (15) to twenty (20) black males "all lined up together" outside the club. (T. 474). According to Alex, his brother Jose said to the group of black males "We don't have no problem with you guys, we just want to leave," but the group would not let them leave and surrounded them. (T. 552). Alex

3

testified that Jose was standing in between himself and Nanez when all of a sudden he saw Jose get hit. (T. 474-475).

Hodge testified that at some point after he left the club, he saw Jose "a distance away" from the back door on the ground, surrounded by a group of approximately ten (10) to fifteen (15) people, some of whom were kicking and hitting him. (T. 108-110, 154, 165-168). According to Hodge, all of the people in the group kicking Jose were black and some had dreadlocks. (T. 110, 154). Hodge testified that he then saw two (2) people from the group run to a car, which he described as a burgundy Honda Accord station wagon. (T. 111-112, 139). He identified the two people as Altonio Warren (Warren) and petitioner. (T. 111). He testified that petitioner and Warren were standing in the group around Jose, but he did not know if they had kicked, punched or stabbed Jose. (T. 112, 173-174). He also did not know in which direction the car they got in drove off. (T. 113). Hodge further testified that once the group kicking Jose scattered, he observed that Jose's head was swollen, his eyes were blackened, his face was purple and he had what appeared to be a stab wound in his side from which blood was dripping. (T. 130-131). Jose did not look like he was breathing and "was just stiff laying on the floor on his side." (Hodge: T. 131; Alex: T. 522; Nanez: T. 713-714).

After Jose was hit, Alex was hit several times, so he did not see anything else after that. (T. 475, 510). According to Alex, it felt like ten (10) people were hitting him with their fists and kicking him, then he staggered into a garbage dumpster and fell. (T. 475-476). He testified that he continued being hit even after he fell, so he curled up in a ball to protect himself. (T. 478, 513). According to Alex, he was struck in the head and face and kicked in the stomach. (T. 476). He did not lose consciousness, but he was bleeding from his face and back. (T. 476).

4

Hodge testified that he saw Alex leaning against a wall on his knees holding his head and crying. (T. 132). According to Hodge, Alex was scratched, cut and swollen "a little bit." (T. 114). According to Nanez, Alex was "pretty beat up." (T. 713). Hodge denied ever seeing petitioner or Warren punch, stab or kick Alex or Jose. (T. 135-136, 142, 166, 172). Alex testified that while he was being beaten, he heard somebody say "Take his money" and felt somebody reach into his pockets and take approximately seventy dollars ($70.00) out. (T. 478-479, 513-514). He did not know who took the money or who beat him. (T. 478).

Alex testified that after his beating stopped, he got up off the ground and looked for his brother. (T. 476). When he saw Jose on the ground, he knelt next to him and said "That's my brother, that's my brother." (T. 477). According to Alex, he heard somebody say "Is that your man, that's your man," so he looked up and got hit again three (3) to four (4) times in the face. (T. 477, 480-481). He described the person who hit him as a black male with a white "cutoff" shirt and dreadlocks. (T. 479-480, 503). He saw two (2) males at that time, both of whom had shoulder-length dreadlocks. (T. 479-480, 504). He did not see where the men went after they stopped hitting him. (T. 481). Alex was unable to identify the two assailants in court, but testified that petitioner and Warren had the same style dreadlocks as the assailants. (T. 493-494, 502, 539-540). He testified that he never saw petitioner or Warren kick or strike him, his brother or anyone else that night and did not know if they, in fact, did so or were even there that night. (T. 503, 510, 539, 541, 556-557).

Alex, Nanez, Hodge and Sanchez all testified that immediately after the incident they observed "Muncho" laying on the ground, bleeding and choking on his own blood. (Alex: T. 497; Nanez: T. 709, 722-723, 726; Hodge: T. 114; Sanchez: T. 248-249). According to Nanez,

5

he pushed "Muncho" onto his side so he could breath better. (T. 709-710). Torres ran toward Nanez to help him with "Muncho." (T. 710). Nanez testified that at the same time, a "blue grayish" Honda Accord station wagon stopped next to them, from which a black male exited, said something, then hit Torres in the face. (T. 710, 723-724, 740-742). He described the assailant as a "tall black male with dreads * * * wearing a white t-shirt." (T. 710, 723-724). According to Nanez, the assailant ran back into the car and the car sped off. (T. 711, 724-725, 741-742).

According to Sanchez, as he was near "Muncho" a Honda station wagon, which appeared to be gray at that time, suddenly stopped beside him and two (2) people exited. (T. 249-251, 279). Sanchez described the two individuals who exited the car as black males in their mid-twenties wearing long dreadlocks and testified that the driver of the vehicle was wearing a bloodied white shirt and the passenger was wearing a cream sweater with shoulder pads. (T. 251-252, 260-261). According to Sanchez, the driver, whom he later identified as petitioner, approached him and asked him if he "wanted it," meaning if he wanted to fight. (T. 253, 269, 296). He replied "No, chill out, I'm just trying to help out" and nothing happened. (T. 254). According to Sanchez, the passenger, whom he later identified as Warren, exited the car and said "I'm crazy, yeah, I'm crazy, Wyandanch, Wyandanch," then went to the crowd and asked Alex if Jose was his brother. (T. 254-255, 270, 297). Sanchez did not see anything else at that time because he was helping "Muncho." (T. 255).

Nanez and Hodge then assisted "Muncho" into a Jeep Cherokee owned by Sanchez. (Nanez: T. 718-719; Hodge: T. 115, 141, 153; Sanchez: T. 259). Sanchez testified that as he was trying to get "Muncho" into his car with the help of some other guys, including Hodge, Warren

6

came back and asked "some guy," whom he later learned was Torres, if "Muncho" "was his boy," i.e. his friend. (T. 256). When Torres responded in the affirmative, Warren punched him in the face, got back into the car and left "into Main Street." (T. 256-258). Sanchez left the scene to take "Muncho" to the hospital, then returned. (T. 259).

Nanez testified that he did not see petitioner or Warren hit anybody on October 5, 2001, participate in the altercation or get out of the Honda. (T. 733, 742-743). Sanchez also denied ever seeing petitioner or Warren kick, stab or punch Jose or Alex. (T. 288, 296-297).

Samuel Wallace testified that on October 5, 2001, he lived across the street from the parking lot where the incident occurred. (T. 616). On that date, he was in his apartment when he heard "a lot of commotion" in the parking lot, so he went outside to the back part of the parking lot. (T. 617, 657). He testified that he saw "a bunch of people on somebody,""a mob of people,"and "two different guys." (T. 617-618). According to Wallace, he did not see the faces of the two men, but he "saw like hair flopping up and down looking like dreads." (T. 618). He also testified that the people he observed in the parking lot were black and Hispanic and that they were physically fighting. (T. 618). Specifically, Wallace testified that he observed an Hispanic man running from "mainly black guys," then the Hispanic man "went down" and Wallace observed him "getting beat up on the ground," a "bunch of people on [him]," and being "stomped on and kicked." (T. 620-622, 686-687, 696). He testified that a few of the black guys running after the Hispanic man wore "dreads in their hair." (T. 621). In addition, he testified that the "guys" who were "stomping" on the Hispanic man had dreadlocks. (T. 622-623, 692-693). Wallace returned to his apartment and called 911, then he returned to the scene. (T. 624-625). According to Wallace, when he returned to the scene he observed individuals whom he knew as

7

"Fats" and "Rolo", and later learned were Christopher Passias and Rodney Hammonds, respectively, leaving the scene in a car. (T. 626). On cross examination, Wallace testified that he used to buy crack cocaine from "Fats." (T. 681). He testified that those individuals were involved in the incident. (T. 691). Wallace testified that after those individuals left, he walked closer to the man who was attacked and identified that man as "Blast." (T. 627).

Wallace testified that approximately thirty (30) to forty (40) minutes after the incident, he rode his bicycle to a green house on Brook Avenue and Harrison place, out of which crack cocaine is sold, where he saw "Fats." (T. 629, 679). According to Wallace, he said to "Fats": "You know you killed Blast" or "you know you guys killed that guy" and Fats responded: "Who gives a F" or "Yes, so what." (T. 629, 671-672, 689). Wallace then returned home. (T. 630).

Wallace testified that he spoke with the police about the incident and that he identified "Fats" and "Rolo" to the police as being involved in the incident. (T. 631, 655). On cross examination, Wallace testified that when he gave a statement to police following the incident, he indicated that he saw two (2) black males kicking an Hispanic male on the ground, and that he identified those men as "Fats" and "Rolo." (T. 663, 668, 672-674). According to Wallace, he saw twenty (20) people involved in the incident, but he only knew those two. (T. 655, 674-675, 692). He admitted that he had not told the police in his prior statement on October 9, 2001 that he had seen someone with dreadlocks kicking the Hispanic man. (T. 675). However, on redirect examination, he testified that he had told the police on October 5, 2001 that two (2) individuals with dreadlocks were kicking and fighting and "stomping, jumping up and down." (T. 694).

On cross examination, Wallace denied seeing petitioner or Warren on the night of the incident. (T. 658-659, 687-688). He also denied ever seeing petitioner or Warren "hanging out

8

with" "Fats" or "Rolo." (T. 661). He testified that he never identified petitioner or Warren as

kicking anybody on the date of the incident. (T. 669). On redirect examination, he testified that

he did not know if petitioner or Warren were at the scene or not. (T. 695).

Wallace admitted that he had been convicted (a) of attempted petit larceny and attempted

criminal impersonation in 1977, for which he was sentenced to a fine and probation for one (1)

year; (b) of criminal possession of a controlled substance (cocaine) in 1988 and 1990, for which

he was sentenced to terms of imprisonment of thirty (30) days for each conviction; (c) in state

court, of possession of a controlled substance (cocaine) later in 1990, for which he was sentenced

to a term of imprisonment of one and one-third (1-1/3) to four (4) years; and (d) of "another

cocaine charge," involving sale or attempted sale of cocaine, in 1997, for which he was sentenced

to a term of imprisonment of two (2) to four (4) years. (T. 652-654, 678). In addition, Wallace

admitted that he had criminal charges pending against him involving "some kind of harassment

and resisting arrest" and "another misdemeanor possession of cocaine." (T. 654-655, 678).


b.    The Stop of Petitioner's Vehicle

Police Officers Philip McSherry and Daniel Colondona testified that on October 5, 2001,

they received a radio transmission to respond to a riot behind Club 69 in Bay Shore, New York.

(McSherry: T. 177-179; Colondona: T. 203). Officer Colondona testified that en route to that

location, he observed a dark colored automobile pass him at a high rate of speed heading

northbound on Maple. (T. 204-205, 212-213).

According to Officer McSherry, he stopped his car at the intersection of Maple Avenue

and Gibson Street looking for a large crowd or disturbance. (T. 179). Approximately thirty (30)

9

seconds later, Officer McSherry received a call from Officer Colondona, who was at the scene of the disturbance, asking him to stop a car that was leaving the scene at a high rate of speed. (McSherry: T. 180; Colondona: T. 205-206). According to Officer McSherry, he observed a car "in a hurry to get out of there," so he blocked that car from exiting the parking lot and approached the driver. (T. 180). He described the driver as a young black female, approximately twenty-two (22) years old in a "semi-hysterical state." (T. 181, 192-193, 198-199). She was alone in the vehicle. (T. 181). Officer McSherry testified that based upon information he received from the young female he had stopped, he placed a radio transmission at approximately 3:27 a.m. to be on the lookout for a burgundy Honda Accord station wagon with several black males in it that was possibly heading toward Wyandanch. (T. 183-184, 200).

Officer McSherry testified that after speaking with that female, he found Officer Colondona, who had radioed to him that several people had been injured. (T. 182). There were approximately seventy-five (75) to one hundred (100) people at the scene and "a lot of movement" or frenzy in the general area. (McSherry: T. 185, 193-194, 196-197; Colondona: T. 206-207). Officer Colondona testified that he observed that Jose was laying on the concrete and was "beat up pretty bad." (T. 207). According to Officer Colondona, Jose was unresponsive to any question posed to him and he was not breathing too well. (T. 211). Officer Colondona further testified that other individuals were injured as well. (T. 211-212).

Sergeant Jeff Gross testified that he was at the Third Precinct when he heard a local radio transmission to look out for a burgundy Honda Accord station wagon that was possibly heading toward Wyandanch. (T. 216-217, 231). According to Sergeant Gross, as he traveled south on Fifth Avenue from the Third Precinct, he observed a vehicle matching that description traveling

10

at a high rate of speed heading westbound on Howells Road, east of Fifth Avenue. (T. 217, 233). Sergeant Gross immediately turned his vehicle around and radioed the dispatcher that he had seen the vehicle. (T. 218). At approximately 3:30 a.m., on Howells Road by the south service road of Sunrise Highway, Sergeant Gross pulled the vehicle over by putting on his emergency lights. (T. 218). He described the vehicle as a burgundy Honda Accord station wagon. (T. 246). Another Third Precinct unit and an Emergency Service Unit arrived at the scene and directed that the people in the vehicle exit the vehicle. (T. 218). The occupants of the vehicle complied and Sergeant Gross and Officer Anthony Pascucci handcuffed them. (Gross: T. 219; Pascucci: T. 387, 389). Sergeant Gross described the occupants of the vehicle as two (2) black males. (T. 219-220). The driver of the vehicle was petitioner and the passenger was Warren. (Pascucci: T. 388-389; Gross: T. 220).

Lieutenant Gerard Gigante testified that during his shift on October 5, 2001, he responded to a location on Howells Road, just south of Sunrise Highway, in Bay Shore, where a vehicle had been stopped that was possibly involved in the incident at Club 69. (T. 322-323). When he arrived at approximately 3:30 a.m., he observed a small "dark colored purple colored station wagon" and two young black males who had been detained and handcuffed behind their backs. (T. 323-325). He learned that the two individuals were petitioner and Warren. (T. 324). Lieutenant Gigante testified that Warren was seated on a curb directly behind the vehicle from which he was detained and petitioner was seated approximately twenty-five (25) feet away from the vehicle. (T. 326, 330). When he asked petitioner if he wanted medical attention for a puncture or slash wound to his shoulder, petitioner replied "No, I'm fine." (T. 326-327).

11

c.     Showup Identifications

Lieutenant Gigante testified that he advised Sergeant James Hickey that he had stopped a station wagon fitting the radio description and inquired as to whether Sergeant Hickey had any potential witnesses at the Club 69 scene that might be able to identify any subjects that were involved in the fight. (T. 327). At approximately 3:55 a.m., Officer Dave Smith brought Sanchez to the scene of the showup identification. (T. 328-329, 376). Officer Smith pulled to within approximately twenty-five (25) feet of the station wagon. (T. 329-330). Lieutenant Gigante testified that he explained to Sanchez that he was going to show him a couple of people and Sanchez was to let him know if he could identify them as having been involved in the disturbance at Club 69. (T. 330, 361-362). An officer accompanied each subject separately to the middle of the road and faced Officer Smith's vehicle, which was illuminated by the bright lights of the vehicle. (Gigante: T. 331-333; Pascucci: T. 391). According to Lieutenant Gigante, Sanchez indicated that he recognized both petitioner and Warren as individuals who had been involved in the fight at Club 69. (T. 332-333, 362-363). Sanchez never indicated that he saw petitioner or Warren kick, punch or stab anyone during the fight. (T. 363).

Sanchez testified that when a police officer arrived, he told them in which direction he observed a gray Honda drive away. (T. 292). He then accompanied the officer to a location near Sunrise Highway, where he observed the Honda station wagon, which at that time, with the police lights shining on it, looked light purple not gray. (T. 262). He testified that he identified the car to the officers as the one he saw at the scene. (T. 263). He also testified that he saw two (2) men sitting on the sidewalk. (T. 263). The officers put the high beams on them and he identified them as the two (2) men he had seen at the Club 69 scene. (T. 263-264). Sanchez

12

identified the individual who was wearing the white bloody shirt as petitioner, and the individual who was wearing the sweater and who had punched Torres as Warren. (T. 264-265).

Hodge testified that the police arrived at the Club 69 scene and he approached one of the officers and told him what happened. (T. 115-116). According to Hodge, the police officers put him in the back of a police car, drove him to an area on the service road of Sunrise Highway where they had pulled "the two gentlemen" over and asked him if those men were at the scene. (T. 116-117, 158). He testified that he answered in the affirmative. (T. 117, 158). Lieutenant Gigante testified that Officer Richard Gandolfo brought Hodge to the scene of the showup at approximately 4:30 a.m., about thirty-five (35) minutes after Sanchez had completed his showup identification and left the scene. (T. 334-335, 344). Lieutenant Gigante explained to Hodge that they were going to let him view a couple of people and to let the officers know if one or both of the subjects had been involved with the disturbance at Club 69. (T. 345). An officer brought each of the subjects separately to an area in front of Officer Gandolfo's vehicle that was illuminated by his "bright lights." (Gigante: T. 345; Pascucci: T. 391). According to Hodge, the two men were shown to him outside the car, standing up with their hands behind their backs, which he assumed meant that they were handcuffed. (T. 117-118). In addition, Hodge identified the vehicle at the scene of the showup procedure as the one he described leaving the scene of the incident. (T. 118-119).

### d.    The Investigation

Officer Pascucci testified that following the showup identifications, at approximately 4:40 a.m., he brought petitioner to Good Samaritan Hospital for treatment of the laceration on his

13

neck. (T. 391-392). According to Officer Pascucci, when one of the emergency room personnel asked petitioner how he was injured, petitioner responded: "It may have been a bottle, he had been involved in a fight at Club 69." (T. 392-393). Petitioner was given stitches and Officer Pascucci transported him to the Third Precinct at approximately 5:40 a.m. (T. 393, 409). At the precinct, Officer Pascucci performed a patdown of petitioner and recovered eight hundred six dollars ($806.00) and an order of protection against Jose Nieves from petitioner's pockets. (T. 395-396, 402, 413).

Detective William Lewis testified that he arrived at the Third Precinct on October 5, 2001 at approximately 7:00 a.m. and saw Officer Pascucci with petitioner in the uniform prisoner processing room. (T. 799-800, 853). He observed that petitioner had a bandage on the left side of his neck and some reddish stains on his shirt. (T. 808, 936). Detective Lewis testified that he received a clear plastic bag from Officer Pascucci, which contained, *inter alia*, a New York State order of protection against Jose Nieves and eight hundred six dollars ($806.00). (T. 801-805, 888, 910). Thereafter, petitioner was moved to an interview room, where he was advised of his constitutional rights. (T. 931-934, 936-938). According to Detective Lewis, petitioner indicated that he understood his rights, waived his right to contact an attorney and agreed to speak with him without a lawyer being present, but refused to sign a waiver of his rights. (T. 939-940, 944, 949).

Detective Lewis testified that he made notes regarding the sum and substance of his conversation with petitioner immediately following the interview. (T. 940-941, 948). According to Detective Lewis, petitioner told him that he had been out with his brother Calvin Davis, his cousin Calvin Jackson and Warren to a club in Bay Shore. (T. 944). Petitioner drove himself

14

and Warren to Club 69 in his maroon Honda Civic and parked behind the club at approximately 1:00 a.m. (T. 945, 956-957). Petitioner indicated that the club was very crowded and they did not know anybody, except for one black female named Ebony. (T. 945). Petitioner then indicated that at approximately 3:30 or 4:00 a.m., he heard a loud yelling in the middle of the bar and the club's bouncers threw everybody out the back door. (T. 945). Petitioner left the club with Warren. (T. 945). When petitioner got outside the club, he saw his brother, Calvin, fighting with "a fat Puerto Rican" in the parking lot. (T. 945-946). Petitioner stated that he "ran up and went through the crowd to get to Calvin." (T. 946). Warren was right next to petitioner. (T. 946). Petitioner indicated that when he was about three (3) feet from "the Puerto Rican guy" he got cut in the neck. (T. 946, 964). Petitioner stated that he then ran to his car, where he met Warren. (T. 946). Petitioner and Warren then left, but got stopped by the police on Montauk Highway. (T. 946). Petitioner denied stealing anything from the Puerto Rican guy involved in the fight. (T. 946). Detective Lewis denied that petitioner ever indicated during the interview that he wanted a lawyer, did not want to speak with Lewis, or that he wanted to conclude the interview. (T. 947).

Detective Leroy Smith also interviewed petitioner and made contemporaneous notes of the sum and substance of that interview. (T. 983, 990-991, 995). Prior to the interview, Detective Smith advised petitioner of his constitutional rights and petitioner signed a waiver of his rights. (T. 985-989). Petitioner's statements, as per Detective Smith's notes, were substantially the same as those he gave to Detective Lewis. (T. 992-993). In addition, petitioner indicated that he had been defending himself and that he did not stab "the fat Spanish guy." (T. 993). He further indicated that "Rolo" (Hammonds), "Fats" (Passias) and "Nasty" (Isaac

15

Marshall) were there and that "Fats" got into an argument with "the fat Spanish guy." (T. 993).

Petitioner stated that "everybody was involved in fights and arguments, his brother, Tony [Warren], 'Nasty' everybody. Fights broke out with his brother and Tony." (T. 993). In addition, petitioner stated that he had taken a piece of paper out of the fat Spanish guy's pocket while he was on the ground. (T. 993, 994). According to Detective Smith, petitioner further stated that he kicked at "the guy" when he was on the ground and while he was standing; he thought "the guy" had swung at him; he thought that he got punched; someone "stuck the guy," but it was not him; "everybody was kicking the guy on the ground;" and "Fats" kicked "the guy" in the head while he was on the ground. (T. 994).

Detective Lewis and Detective Smith came into contact with Warren in the detective squad room area of the Third Precinct at approximately 9:00 a.m. on October 5, 2001. (Lewis: T. 809-811, 843; Smith: T. 1045). Both detectives testified that they observed Warren rubbing his shoes together, then brushing or wiping them against the back of his pants, which brought their attention to Warren's feet. (Lewis: T. 811-814, 845; Smith: T. 1048-1051). Warren was wearing black or dark-colored Uptown boots. (Lewis: T. 811; Smith: T. 1051). Detective Lewis testified that he noticed that there was reddish brown stains on the tops, fronts and sides of Warren's boots, (T. 814), and Detective Smith testified that he saw spots on Warren's boots that appeared to be blood, (T. 1051). Thereafter, Detective Smith took the boots and gave them to Detective Robert Henn to be processed as evidence. (Lewis: T. 815-816; Smith: T. 1051-1052; Henn: T. 1154-1155). Seven hundred ninety-two dollars ($792.00) was also taken from Warren's pocket. (Lewis: T. 817-818; Smith: T. 1047).

Detective Smith testified that after he recovered Warren's boots, he went into the

interview room where petitioner was being held and observed that petitioner was wearing Black Timberland boots spotted with what appeared to him to be blood. (T. 1053). Thereafter, Detective Smith recovered the boots from petitioner and gave them to Detective Henn to be processed as evidence. (Smith: T. 1053-1055; Henn: T. 1154-1155). The crime lab initially rejected the evidence brought to it by Detective Henn because it was not packaged properly, insofar as the evidence had not been sealed with evidence tape, initialed and dated by Henn. (Smith: T. 1056-1057, 1065, 1106; Gallagher: T. 1195, 1203). The evidence bag had been sealed with staples and initialed by Detective Henn, but Detective Henn did not also seal the bag with evidence tape and initial the tape as required by police procedure at that time. (Smith: T. 1107-1109, 1119-1120, 1125, 1136-1137; Henn: T. 1160, 1177, 1182-1184; Gallagher: T. 1195-1196, 1203, 1205).

Diane Alia, a forensic serologist at the Suffolk County crime laboratory, (T. 1210-1211), testified that she analyzed the boots recovered from petitioner. (T. 1217). According to Alia, she identified two (2) stains on petitioner's left boot and two (2) stains on petitioner's right boot and she identified three (3) out of four (4) of them as blood. (T. 1218-1219). According to Alia, the stain on the bottom of petitioner's left boot was negative, but the stains on the top and right side of the left boot and the "furthermost front" of the right boot tested positive as blood. (T. 1220-1221). Alia testified that the stains on the top and right side of petitioner's left boot were drops, indicating that the blood came through the air and was deposited on the surface of the boots, as opposed to being made from coming into contact with an item containing blood. (T. 1222-1223). Alia further testified that it was difficult to interpret from where the blood on petitioner's right boot came because it was on textured rubber. (T. 1224). According to Alia, the stains on

17

petitioner's boots were not consistent with somebody walking through blood because the pattern was not consistent and there was not blood on the bottom of either boot. (T. 1226, 1285, 1310-1311). On cross examination, Alia testified that if an individual was stomping on another individual on the ground, there would be blood on the bottom of the boots. (T. 1285). Alia collected the blood samples from petitioner's boots and submitted them for DNA testing, which was performed by Robert Baumann. (T. 1225). Baumann testified that Jose Nieves could have been the source of the blood on petitioner's right boot. (T. 1330, 1353). Petitioner was the source of the blood on his own left boot, although one stain was a mixture of both Jose's and petitioner's DNA. (Alia: T. 1293; Baumann: T. 1330-1332).

Alia also analyzed the boots recovered from Warren and recovered two (2) "representative" stains from the right sides of each boot in November 2001. (T. 1226-1228). According to Alia, there was more blood on Warren's boots than petitioner's boots so she picked just two stains which appeared large enough on which to do all necessary testing. (T. 1227-1228). Alia testified that she also observed red stains on the laces and soles of the boots, as well as on the heel of the right boot. (T. 1228). According to Alia, the surface of Warren's boots were fabric and, thus, very porous, making pattern interpretation, i.e. whether the stain was a drop or a contact stain, very difficult. (T. 1230, 1266). Alia testified that both stains tested positive as consistent with human blood. (T. 1230). According to Alia, a stain recovered from the tip of Warren's boot in April 2003, at the request of the prosecutor, also tested positive as being consistent with human blood. (T. 1232-1233). Alia testified that a stain on the bottom of Warren's right boot could have been made by walking through blood, but that not all of the stain on the upper portion of that boot could have been made that way because of where the stains

18

were located, i.e. on the arch area of the foot, the toe of the right boot and on the left side of the left boot. (T. 1233-1235, 1310-1311). According to Alia, no blood was recovered on the instep area of the right foot. (T. 1236). In addition, Alia testified that not all of the stains on Warren's boots could have occurred as part of one incident. (T. 1237-1238). Baumann testified that the blood recovered from both of Warren's boots was a match with the DNA profile of Jose Nieves, and excluded Warren and petitioner as sources. (T. 1332, 1341, 1353).

Detective Smith testified that during the course of his investigation, he received information from a confidential informant regarding the whereabouts of Passias and Hammonds, so he contacted the police in Bristol, Tennessee who apprehended those individuals. (T. 1081). Passias and Hammonds were eventually brought back to Suffolk County, New York and arrested on the same charges as petitioner and Warren. (T. 1082, 1111).

Detective Smith further testified that he unsuccessfully attempted to locate Ramon DeGross a/k/a "Muncho" and Torres to testify at the trial. (T. 1084-1086). On cross examination, Detectives Lewis and Smith testified that during a photographic lineup Torres identified Isaac Marshall as the person who hit Alex. (Lewis: T. 838-839; Smith: T. 1118).


       e.      Physical Injuries and Cause of Death

Patricia Molinari is a volunteer emergency medical technician who responded to the scene. (T. 571-572). She observed Jose on his right side with severe facial trauma. (T. 574). She testified that he was groaning and not breathing adequately, but he was breathing and his bleeding had been controlled, i.e. it was not oozing or spurting. (T. 574-576, 587, 590). She also observed a wound on his back. (T. 575). By the time Jose was placed into the ambulance, he

had no pulse and was not breathing at all, so CPR was commenced. (T. 577). He was not breathing and did not have a pulse when they arrived at the hospital. (T. 580). He was never revived, (Molinari: T. 580), and was pronounced dead at the hospital, (Wilson: T. 1300).

Dr. James W. C. Wilson, the medical examiner who performed the autopsy on Jose Nieves on October 5, 2001, testified that during his external examination he observed that Jose's head and face were very swollen; there was a large amount of blunt impact injury on the face region; Jose's eyelids were very purple and discolored; his nose was fractured; there was multiple contusions and abrasions over his entire face, on the back of his head behind the ears and on his neck; there were tiny abrasions on a portion of his left hand; there were abrasions at his right knee; there were two stab wounds, one in the left flank and one very high up on his right thigh, almost to the buttock area; and there were superficial marks on his back consistent with scratches or punctures from the tip of a knife. (T. 1377-1378, 1387-1392, 1395). Dr. Wilson testified that the stab wound to Jose's left flank was approximately two (2) to three (3) inches deep, extended through the skin and the subcutaneous fatty tissue of the left flank region and did not injure any major blood vessel. (T. 1383-1384). Dr. Wilson further testified that the stab wound on Jose's right thigh projected approximately two and one-half (2-1/2) to three (3) inches into the deep connective tissue of the back of the thigh and also did not impact any major blood vessel, nerve or major organ of the body. (T. 1385-1386). According to Dr. Wilson, he would not expect a large amount of bleeding to emanate or "gush" from either stab wound, the scratches on Jose's back or any of the other injuries, although there would be a continuous flow of blood down his face from the broken nose and bleeding from lip and tongue lacerations. (T. 1384-1385, 1387-1388, 1392-1393, 1420, 1438-1441). On cross examination, Dr. Wilson denied that the amount

20

of blood flowing from Jose's nose or in his mouth could have flown "out among the crowd." (T. 1440).

Dr. Wilson testified that during his internal examination of Jose, he observed hemorrhages in the deeper part of the scalp and in the tissue attached to the skull, indicating multiple and severe blows to his head. (T. 1396-1399). Dr. Wilson testified that the nature of the object that struck Jose's head "would be something that wouldn't be expected to tear the scalp easily, if at all. The kind of things that could be accomplished with something like fists or feet or feet with shoes on * * * [or] forearms and elbows." (T. 1400). Dr. Wilson further testified that petitioner's and Warren's boots could have caused the type of injury sustained by Jose. (T. 1401-1402). Dr. Wilson opined that Jose sustained approximately twenty (20) to forty (40) individual blows to his head. (T. 1402-1403, 1421, 1425). According to Dr. Wilson, there were no lacerations to Jose's head, other than his lip, and there would be no blood loss outside of Jose's body as a result of the head injuries, with the exception of the fractured nose and lip laceration. (T. 1398). Dr. Wilson classified the manner of Jose's death as a homicide and testified that the cause of Jose's death was "blunt craniocerebral trauma," i.e. blunt trauma to the head, and that contributory factors were the stab wounds to his right thigh and left flank. (T. 1404, 1453, 1458). Dr. Wilson testified that the stab wounds were not immediately life threatening, but contributed to Jose's death because "It's not going to help anybody to to [sic] get a stab wound who's sustaining a beating of sort that [Jose] sustained." (T. 1404). He also testified that the stab wounds would not necessarily have caused Jose to fall down and even if they did, they would not have prevented him from standing up again and running away. (T. 1412-1413). However, the head injuries would have rendered Jose unconscious or "at least in a

21

comatose state." (T. 1413). According to Wilson, Jose's injuries, particularly the abrasions on his forehead, were consistent with him lying face down on the ground while being struck by people wearing boots. (T. 1413-1415). He also testified that he would expect an object or boot coming into contact with Jose's facial area to get blood on it. (T. 1415-1416).

Dr. Wilson testified that there was ethanol, i.e. alcohol, and cocaine in Jose's system. (T. 1405). However, according to Dr. Wilson, he would not characterize the level of those drugs in Jose's body as being in a "toxic situation," i.e. Jose would not have died as a result of the amounts of cocaine in his body had it not been for the trauma he sustained. (T. 1407-1408). Dr. Wilson further testified that Jose was not in great health, insofar as he was obese, he had a slightly enlarged heart and he had an enlarged liver with fatty change in the liver cells. (T. 1408-1409). However, he testified that he would not expect Jose to have died from his health condition at the age of twenty-nine (29) years. (T. 1409). According to Dr. Wilson, Jose died because of multiple severe blows that he sustained to his head which, in addition to his body responding to the danger of a fight or attack, resulted in the failure of his basic physiology, i.e. his cardiovascular system, already overstressed from his weight and cocaine ingestion, and his respiratory system failed. (T. 1410-1411). On cross examination, Dr. Wilson testified that he would not consider the amount of cocaine in Jose's body to be a contributory factor "to a man dying after sustaining a beating to the extent that [Jose] sustained." (T. 1446). According to Dr. Wilson, Jose would not have died but for the beating he received. (T. 1458).

During the autopsy of Jose, Wilson recovered a quantity of cocaine, i.e. six (6) small packets of "8-balls" or one-eighth of an ounce or three half grams of cocaine, which appeared packaged for sale, from Jose's body folds. (Lewis: T. 822-825, 861; Wilson: T. 1334-1335).

Molinari testified that she returned to the scene after transporting Jose to the hospital and also transported Torres and Alex to the hospital. (T. 580-581). She testified that Torres was complaining of pain in his arm and Alex had some superficial cuts on his face and swelling to his forehead. (T. 581-582, 584).

At the close of the People's case, defense counsel moved to dismiss the assault in the first degree and gang assault charges involving Alex on the basis that the People failed to prove beyond a reasonable doubt that Alex sustained a serious physical injury, that petitioner or Warren were involved with the injuries caused to Alex, or that petitioner or Warren acted with other individuals. (T. 1459-1461, 1463). In addition, defense counsel moved to dismiss the gang assault count involving Jose on the basis that there was no evidence that petitioner or Warren acted with three or more individuals. (T. 1460). The People requested that the trial court charge assault in the third degree as a lesser included offense of assault in the first degree with respect to Alex. (T. 1461-1462). The trial court denied defense counsel's motions. (T. 1463-1464).

### 3. The Defense

Neither petitioner nor Warren presented any defense. (T. 1464-1465).

### 4. Verdict and Sentence

Following a jury trial, petitioner was found guilty of manslaughter in the first degree (N.Y. Penal Law § 125.20), gang assault in the first degree (N.Y. Penal Law § 120.07), assault in the first degree (N.Y. Penal Law § 120.10(3)) and two counts of assault in the third degree (N.Y. Penal Law §§ 120.00(1)(2)). (T. 1601-1602). On October 28, 2003, petitioner was sentenced, as

a second violent felony offender, to concurrent determinate terms of imprisonment of twenty-five (25) years to be followed by five (5) year periods of post-release supervision for each of his convictions of manslaughter, gang assault and assault in the first degree, and to concurrent determinate terms of imprisonment of one (1) year for each of his convictions of assault in the third degree.

       B.     Procedural History

Petitioner appealed the judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department on the grounds, *inter alia*: (1) that the trial court erred in submitting charges to the jury that contained the opposing *mens rea* of acting intentionally and acting recklessly, and in failing to instruct the jury in the alternative; (2) that he was denied his constitutional rights to present a defense and call witnesses by a plea agreement between the prosecutor and co-defendant Christopher Passias, pursuant to which Passias agreed not to testify on petitioner's behalf; and (3) that the evidence was legally insufficient to support his conviction. On April 24, 2007, the Appellate Division, Second Department affirmed the judgment of conviction, finding, *inter alia*, (1) that petitioner's legal insufficiency argument was unpreserved for appellate review pursuant to N.Y. C.P.L. § 470.05(2) and that, in any event, the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt; (2) that petitioner was not deprived of a fair trial by the plea agreement between the prosecutor and Passias because Passias's allocution demonstrated that his testimony would not have exculpated petitioner; and (3) that petitioner's claim that the jury verdict was inconsistent was unpreserved for appellate review pursuant to N.Y. C.P.L. § 470.05(2) and, in any event, the verdict was not

repugnant or inconsistent. <u>People v. Davis</u>, 39 A.D.3d 873, 835 N.Y.S.2d 311 (2d Dept. 2007).

On June 22, 2007, the New York State Court of Appeals denied leave to appeal the order of the

Appellate Division. <u>People v. Davis</u>, 9 N.Y.3d 842, 840 N.Y.S.2d 768, 872 N.E.2d 881 (2007).

On or about October 15, 2007, petitioner moved pursuant to N.Y. C.P.L. § 440.20 to set

aside his sentence as illegal because the sentence of twenty-five (25) years followed by a five (5)

year period of post-release supervision on his convictions for manslaughter in the first degree,

gang assault in the first degree and assault in the first degree, all class B violent felony offenses,

exceeded the maximum sentence of twenty-five (25) years set forth in N.Y. Penal Law §§

70.00(2)(B) and 70.02(3)(A). By order dated December 10, 2007, the County Court of Suffolk

County (Hinrichs, J.) denied petitioner's 440.20 motion without a hearing on the basis that N.Y.

Penal Law § 70.45 mandates the additional period of post-release supervision and, thus,

petitioner's sentence was not "unauthorized, illegally imposed or otherwise invalid as a matter of

law" pursuant to Section 440.20. <u>People v. Davis</u>, No. 2231A-2001 (N.Y. County Ct., Dec. 10,

2007). On March 28, 2008, the Appellate Division, Second Department (Lifson, J.) denied

petitioner's application for leave to appeal the denial of his 440.20 motion. <u>People v. Davis</u>, No.

2008-00304 (2d Dept. Mar. 28, 2008).

On or about June 25, 2008, petitioner filed this petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254, alleging (1) that the verdict convicting him of crimes requiring

*mens rea* of both acting intentionally and acting recklessly was inconsistent; (2) that he was

denied his right to present a defense and to call and examine witnesses by the plea agreement

between the prosecutor and Passias, pursuant to which Passias agreed not to testify on

petitioner's behalf; (3) that the evidence was legally insufficient to establish his guilt beyond a

25

reasonable doubt; and (4) that the sentence imposed was illegal. Respondent filed his return on October 17, 2008.

II.    DISCUSSION

    A.    Procedurally Defaulted Claims

A federal court may not review a state prisoner's federal claims if the claims were denied in state court pursuant to an independent and adequate state procedural rule, "unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 749-750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). In order for federal habeas review to be procedurally defaulted, the state court's reliance on state law must be "clear from the face of the opinion." Fama v. Commissioner of Correctional Services, 235 F.3d 804, 809 (2d Cir. 2000) (internal quotations and citation omitted). If a state court holding contains a plain statement that a claim is procedurally defaulted then the federal habeas court may not review it, even if the state court also rejected the claim on the merits in the alternative. See Harris v. Reed, 489 U.S. 255, 264 n.10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision). When a state court says that a claim is "not preserved for appellate review" and then rules "in any event" on the merits, such a claim is procedurally defaulted. See Green v. Travis, 414 F.3d 288, 294 (2d Cir. 2005).

On direct appeal, the Appellate Division, Second Department rejected petitioner's claims

26

that the jury verdict was inconsistent and that the evidence was legally sufficient as "unpreserved for appellate review" pursuant to N.Y. C.P.L. § 470.05(2), then ruled on the merits of those claims "in any event." People v. Davis, 39 A.D.3d at 874-875, 835 N.Y.S.2d 311. Since the Appellate Division clearly invoked a state procedural rule as a basis for its rejection of petitioner's claims regarding the consistency of the jury verdict and the legal sufficiency of the evidence, see, e.g. Richardson v. Greene, 497 F.3d 212 (2d Cir. 2007), and petitioner has not alleged cause for the default, actual prejudice, or that it would be a fundamental miscarriage of justice if those claims were not reviewed, those claims (petitioner's first and third grounds for relief) are barred from federal habeas review and must be dismissed.

B.     Standard of Review under AEDPA[2]

The Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, governs applications of incarcerated state court defendants seeking federal habeas corpus relief. Pursuant to 28 U.S.C. § 2254(d), an application for a writ of habeas corpus that has met the procedural prerequisites

> shall not be granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State court
> proceeding.

§ 2254(d). "An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and

---

[2] It is undisputed that the state courts adjudicated petitioner's remaining claims on the merits, thus triggering the AEDPA standard of review.

(2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (citing Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)); see also Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006) (accord).

Once claims have been adjudicated on the merits, "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254 (d)(1). Alternatively, a federal habeas court may "'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing Williams, 529 U.S. at 413, 120 S.Ct. 1495). Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411, 120 S.Ct. 1495; see also Wiggins, 539 U.S. at 520-521, 123 S.Ct. 2527 (holding that the state court's decision must have been more than incorrect or erroneous; its application must have been "objectively unreasonable"). Under the AEDPA, determination of the factual issues made by a state court "shall be presumed to be correct," and the applicant "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

1.     Plea Agreement

The conditions of the plea agreement between the prosecution and Passias were (1) that, if requested, he would testify against his co-defendants, including petitioner; (2) that he would testify truthfully about what happened on the date of the incident; and (3) that he could not testify on behalf of petitioner or Warren, and that if he did, his negotiated sentence of one (1) year in the Suffolk County jail could be enhanced to a determinate term of imprisonment of seven (7) years in an upstate facility. (Plea Agreement [P.] 3-4, 15-18). During his allocution, Passias testified that on the date of the incident, he was at Club 69 and saw, *inter alia*, petitioner and Warren, both of whom were acquaintances of his, and some Hispanic males. (P. 8-11). Passias further testified that there came a time that a disturbance occurred inside the club between, *inter alia*, petitioner, Warren and the Hispanic males, as a result of which employees of the club ordered everybody outside. (P. 9-10). Passias then testified as follows:

> "There was an argument. A couple of people started fighting, and they ran toward the crowd. I'm not sure who was fighting, but I know I seen Warren and Davis [petitioner] in the crowd. * * *. They [petitioner and Warren] was in a brawl. You know what I'm saying? I don't know if they were fighting or trying to break it up, but I know they were in that area."

(P. 12-13). When asked if petitioner and Warren got involved in the fight, Passias responded "yes." (P. 13). He denied that Hammonds a/k/a "Rolo" or Marshall a/k/a "Nasty" were involved in the fight. (P. 13). When asked if he said anything during the fight, Passias replied that he asked Jose "what was good" and Jose responded that he did not want any problems and was taking his people out of there. (P. 13-14). According to Passias, that was when the fight broke out and everyone rushed toward the fight. (P. 14). Passias testified that during the fight, and even after Jose was on the ground, he commanded the people he was with, including petitioner and Warren, to "get him." (P. 14-15).

A criminal defendant has a right to a fair opportunity to defend himself against the state's accusations by presenting witnesses. See Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); Webb v. Texas, 409 U.S. 95, 98, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). "[J]udicial or prosecutorial intimidation that dissuades a potential defense witness from testifying for the defense can, under certain circumstances, violate the defendant's right to present a defense." United States v. Williams, 205 F.3d 23, 29 (2d Cir. 2000). However, "[t]he right to present a defense, and its concomitant right to compulsory process, are not unqualified; they are subject to 'countervailing public interests,'" Buie v. Sullivan, 923 F.2d 10, 11 (2d Cir. 1990) (quoting Taylor v. Illinois, 484 U.S. 400, 414, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988)), including arresting and prosecuting suspected criminals, Id., preventing perjury and investigating past criminal conduct. Williams, 205 F.3d at 29. "To establish a violation of the right [to present a defense], a criminal defendant must generally show that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means * * * [and] that [there was] bad faith on the part of the government." Williams, 205 F.3d at 29; see also United States v. Valenzuela-Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982) (holding that the Sixth Amendment does not grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses; it guarantees him "compulsory process for obtaining witnesses in his favor"); United States v. Scopo, 861 F.2d 339, 345 (2d Cir. 1988) (holding that a defendant who complains that his right to call witnesses has been violated must show how their testimony would have been both material and favorable to his defense). In addition, "the defendant 'must demonstrate that the absence of fundamental fairness infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial.'" Williams, 205 F.3d at 29-30 (quoting Buie, 923 F.2d at 11-12).

The state court found that petitioner was not denied his right to a fair trial by the plea agreement between the prosecution and Passias because Passias's "allocution demonstrated that his testimony would not have exculpated [petitioner]." People v. Davis, 39 A.D.3d at 874, 835 N.Y.S.2d 311. The state court's determination is not contrary to, or an unreasonable application of, clearly established federal law, nor did the Appellate Division base its decision on an unreasonable determination of the facts. Indeed, it is clear from Passias's allocution that his testimony would not have exculpated petitioner and, thus, the plea agreement did not deprive petitioner of evidence favorable to his defense. Accordingly, habeas relief is not warranted on this claim.

### 2. Sentence

Petitioner contends that his sentence exceeds the statutory maximum provided by N.Y. Penal Law § 70.00(2)(b).

To evaluate claims of excessive sentencing, the Supreme Court has articulated a principle of "gross proportionality," which finds unconstitutional under the Eighth Amendment only extreme sentences that are grossly disproportionate to the crimes for which they are imposed. See, Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). Federal courts reviewing sentences imposed by state courts on habeas corpus review "should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." Solem, 463 U.S. at 290, 103 S.Ct. 3001. The "gross disproportionality" principle finds sentences disproportionate to their crimes "only in the

31

exceedingly rare and extreme case" and is reserved "for only the extraordinary case." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73-77, 123, S.Ct. 1166, 155 L.Ed. 2d 144 (2003) (internal quotation marks and citation omitted); <u>see also, United States v. Snype</u>, 441 F.3d 119, 152 (2d Cir. 2006) (noting that successful challenges to the proportionality of particular sentences have been exceedingly rare). In the Second Circuit, "[n]o federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." <u>White v. Keane</u>, 969 F.2d 1381, 1383 (2d Cir. 1992); <u>see also, United States v. Gonzalez</u>, 922 F.2d 1044, 1053 (2d Cir. 1991) (finding that courts should review the disproportionality of sentences only in rare cases because the legislature's fixing of terms for imprisonment is presumptively valid).

Contrary to petitioner's contention, the sentence imposed was within the statutory range prescribed by N.Y. Penal Law §§ 70.00 and 70.45. <u>White</u>, 969 F.2d at 1383. The New York Court of Appeals has recognized that:

> "[i]n eliminating parole for all violent felony offenders in 1998, the Legislature enacted a scheme of determinate sentencing *to be followed by periods of mandatory postrelease supervision* ( see L. 1998, ch. 1 [Jenna's Law] ), and defined each determinate sentence *to "also include[ ], as a part thereof, an additional period of post-release supervision"* (Penal Law § 70.45[1]; see also Senate Mem. in Support, 1998 McKinney's Session Laws of N.Y., at 1489 [describing postrelease supervision as "a distinct but integral part of the determinate sentence"] ). Whereas the term of supervision to be imposed may vary depending on the degree of the crime and the defendant's criminal record ( see Penal Law § 70.45[2] ), imposition of supervision is mandatory and thus "has a definite, immediate and largely automatic effect on defendant's punishment."

<u>People v. Catu</u>, 4 N.Y.3d 242, 244, 792 N.Y.S.2d 887, 825 N.E.2d 1081 (2005). The New York Legislature's determination that post-release supervision must follow a determinate prison sentence for violent felony offenders is entitled to substantial deference by this Court. <u>See Solem</u>, 463 U.S. at 290, 103 S.Ct. 3001. Thus, the state court's determination that petitioner's sentence was not

"unauthorized, illegally imposed or otherwise invalid as a matter of law" is not contrary to, and does not involve an unreasonable application of, federal law. Nor has petitioner demonstrated that the Appellate Division based its decision on an unreasonable determination of the facts in light of the evidence presented in the trial court proceeding. See, 28 U.S.C. § 2254(d). Accordingly, petitioner's illegal sentence claim does not warrant habeas corpus relief.

III.    CONCLUSION

The petition for a writ of habeas corpus is denied in its entirety and the proceeding is dismissed. Since petitioner has failed to make a substantial showing of a denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253; see also Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003); Luciadore v. New York State Div. of Parole, 209 F.3d 107, 112 (2d Cir. 2000); Kellogg v. Strack, 269 F.3d 100, 102 (2d Cir. 2001). Petitioner has a right to seek a certificate of appealability from the Court of Appeals for the Second Circuit. See, 28 U.S.C. § 2253. The Clerk of the Court is directed to close this case.

SO ORDERED.

SANDRA J. FEUERSTEIN
United States District Judge

Dated:    December 2, 2008
          Central Islip, New York

Copies to:

Daniel Davis, *pro se*
03-A-5891
Sing Sing Correctional Facility
354 Hunter Street
Ossining, New York 10562

33

Suffolk County District Attorney's Office
200 Center Drive
Riverhead, New York 11901
Attn:   Grazia DiVincenzo
         Assistant District Attorney